# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                                    CRIMINAL ACTION

VERSUS                                                               17-43-SDD-RLB

ANTHONY POCHE

## RULING

This matter is before the Court on the *Motion to Suppress*[1] filed by the Defendant, Anthony Poche ("Defendant" or "Poche").  The United States ("the Government") has filed an *Opposition*[2] to this motion.  The Court held an evidentiary hearing on this motion on August 16, 2017 and took the matter under advisement.[3] The Court ordered post hearing briefs from the parties.[4]  The Court has considered the arguments of the Parties, the testimony and evidence presented at the hearing, the post hearing briefs, and the law as applied to the facts of this case.  For the reasons set forth below, the Defendant's motion shall be DENIED.

## I.    FACTUAL BACKGROUND[5]

Officers with the Denham Springs Police Department ("DSPD") responded to a dispatch for a "wellness check" around midday on January 16, 2017.[6]  The wellness check was prompted by a call from an unnamed individual who observed a late model Ford truck

---

[1] Rec. Doc. 20.
[2] Rec. Doc. 22.
[3] Rec. Doc. 27.
[4] *Id.*
[5] The factual background was derived from the Parties' briefs and testimony presented at the hearing.
[6] Rec. Doc. 31, p. 14, ll. 22-23.

40939

pull into the parking lot of a business and park midday.[7]  The truck was not parked in a designated space.[8]  The individual approached the truck and found the driver, a Caucasian female, and a passenger, an African-American male, apparently passed out.[9] The individual was unsuccessful in his attempts to wake the driver and the passenger of the truck and called authorities.[10]  The passenger of the truck, Anthony Poche, is the Defendant in the present case.  In a pat down of Poche, officers discovered a firearm. Poche was indicted on one count of possession of a firearm by a convicted felon (Count 1).[11]  Poche moves to suppress all the evidence resulting from the traffic stop and arrest.

DSPD Officer Scott Sterling ("Sterling") responded to the wellness check within minutes of being dispatched and was the first officer to arrive in the parking lot.[12]  Seconds after Sterling's arrival, DSPD Officer Justin Davis ("Davis") arrived, followed by Officer Fairburn ("Fairburn").[13] Sterling approached the driver of the truck, a Caucasian female, and Davis approached the Defendant who was the passenger, an African-American male.[14]  According to Sterling, the driver was passed out slumped toward the steering wheel, and the Defendant was passed out slumped toward the center console of the truck.[15]  The driver's window was down but the passenger window was up.[16]  Sterling observed injection marks and drops of blood on the driver's jacket.[17]  Sterling testified

---

[7] *Id.*
[8] *Id.* at p. 32, ll.19-23.
[9] *Id.*
[10] *Id.* at ll. 22-25.
[11] Rec. Doc. 1.
[12] Rec. Doc. 31 at p. 32, ll. 1-3.
[13] *Id.* at p. 32, ll. 7-11; p. 54, ll. 10-22.
[14] *Id.* at p. 31, p. 53, ll. 7-12, p. 53, l. 25, p. 54, l. 1.
[15] *Id.* at p. 32 ll. 12-17, p. 34, ll. 7-12.
[16] *Id.* at p. 19, ll.3-7, p. 74, ll. 23-24.
[17] *Id.* at p. 19, ll. 19-25.

40939

that there was a hypodermic needle on the center console of the truck, but this information was not contained in his report.[18] Both officers testified that they believed both the driver and the Defendant were under the influence of narcotics, specifically heroin.[19]

The driver was treated by Acadian Ambulance for a heroin overdose. The driver was not searched by DPSD officers at the scene.[20] After receiving treatment on the scene the driver was transported by ambulance to an area hospital.

The Defendant, on the other hand, who Sterling testified was in the same condition as the driver,[21] was removed from the vehicle and patted down by Officer Davis.[22] After removing Poche from the vehicle, Davis asked the Defendant for his name, which the Defendant was able to provide.[23] After the Defendant gave his name to Davis, Davis began a pat down search of the Defendant.[24] The pat down yielded the gun which is the subject of this motion.

Davis conceded that he had no "specific and articulable facts" that gave rise to a reasonable suspicion of criminal activity when he commenced the pat down of Poche.[25] Rather, Davis testified that it is his common practice to request the name of individuals

---

[18] Rec. Doc. 31, p. 35, ll. 1-25, p. 36, l. 1.
[19] *Id.* at p. 51, p. 52, ll. 1-12.
[20] *Id.* at p. 40, ll.18-19.
[21] *Id.* at ll. 9-11.
[22] *Id.* at p. 53, ll. 10-11.
[23] *Id.*
[24] Rec. Doc. 31, at p. 53, l. 25, p. 54, l. 1.
[25] *Id.* at p. 89, ll. 16-19. "While the Fourth Amendment generally requires officers to obtain a warrant before searching or seizing an individual, under the "very narrow exception" announced in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), police officers may briefly detain a person for investigative purposes if they can point to "specific and articulable facts" that give rise to reasonable suspicion that a particular person has committed, is committing, or is about to commit a crime." *United States v. Monsivais*, 848 F.3d 353, 357 (5th. Cir. 2017)(citing *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014)).
40939

he comes into contact with while on duty[26] and perform a pat down search.[27] Calling into question Davis's motives in detaining and patting down Poche,[28] the defense cross examined Davis about a racist remark he made on Facebook regarding an African-American LSU football player, a remark which cost him his job as a Livingston Parish Sheriff's Deputy, before he became a Denham Springs Police Officer.[29]

On the sequence of events, Davis testified:

> [A]fter I began my pat down search, I asked him did he have other identification to verify his name. He did tell me he had a[n] identification in his pocket of his pants. At that time I did ask him if I could go in his front pocket to remove the ID. He said, yes. Once I removed the ID, I looked at the ID very quickly and it showed it was Anthony Poche on the ID, which is the name that he gave me at that time.[30]

Davis gave the Defendant's ID to Fairburn to run "through [National Crime Information Center] NCIC, just to verify if there's any kind of wanted person, or if it's a missing person or anything like that."[31] According to Davis, running an ID through NCIC is standard protocol.[32]

After handing the ID to Fairburn, Davis resumed his pat down search of the Defendant. During the pat down Davis overheard, by radio transmission, that the

---

[26] Rec. Doc. 31, p. 53, ll. 12-15.

[27] "You learned that it's okay to pat anyone down even if they don't pose a threat or danger, as long as you're interacting with them? Yes, Sir. And they can refuse the pat-down." *Id.* at p. 89, ll. 16-19.

[28] The driver, who was a female Caucasian, was not searched, whereas, Poche, an African-American male, was searched. Furthermore, despite Sterling's testimony that the driver and Poche were in the same condition, the driver was immediately treated for a heroin overdose, while the Defendant was only later treated for a heroin overdose after he was transported to a DSPD station for booking. *Id.* at p. 40, ll. 9-11, ll. 18-19, p. 45, ll. 2-15.

[29] Rec. Doc. 31, p. 65, ll. 4-24, p. 66, ll. 1-6.

[30] *Id.* at p. 54, l 1-8.

[31] *Id.* at ll. 10-22.

[32] *Id.* at ll. 24-25, p. 55, l.1.

40939

Defendant was wanted for an outstanding bench warrant in East Baton Rouge Parish.[33]

Davis continued the pat down of the Defendant and discovered a firearm in the back pocket of the Defendant's pants.[34] Davis testified:

> At that time I was familiar with the object, because it felt like a gun at that time. So I asked and he answered me at that time, if there was anything in his pocket, if it was a gun or anything like that. And he did say there was a gun in his pocket. At that time I did remove the gun and was able to make it safe for the officers and the public around the area.[35]

Once Davis discovered the firearm he handcuffed and detained the Defendant in the back of a marked unit.[36] Davis testified that, once he receives information that an individual is wanted by another law enforcement agency, the individual is detained and advised of their rights.[37] Poche was arrested and advised of his rights as a result of the EBR warrant.[38] According to Davis, even if he had not discovered the Defendant's firearm as a result of the pat down, a search incident to the arrest on the bench warrant would have revealed the firearm sought to be suppressed.[39]

The Defendant argues that Davis's seizure and search of his person was a violation of the Fourth Amendment.[40] The Government argues that the inevitable discovery exception to the Fourth Amendment warrant requirement applies and the gun Davis discovered is admissible.[41]

---

[33] *Id.* at p. 56, ll. 1-3, p. 58, ll. 23-25, p. 59, l. 1.
[34] *Id.* at, p. 56, ll. 1-3, p. 58, ll. 23-25, p. 59, l. 1. P. 45, ll. 2-15.
[35] Rec. Doc. 31 at p. 57, ll. 6-15.
[36] *Id.* at p. 58, ll. 1-5.
[37] *Id.* at ll. 10-19.
[38] *Id.* at p. 59, ll. 15-25.
[39] *Id.* at p. 61, ll. 7-14.
[40] Rec. Doc. 32.
[41] Rec. Doc. 32, p. 2.

40939

## II. LAW & ANALYSIS

### A. Fourth Amendment

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[42]

As recently outlined by the Fifth Circuit in *United States v. Monsivais*:

> While the Fourth Amendment generally requires officers to obtain a warrant before searching or seizing an individual, under the "very narrow exception" announced in *Terry v. Ohio*, police officers may briefly detain a person for investigative purposes if they can point to "specific and articulable facts" that give rise to reasonable suspicion that a particular person has committed, is committing, or is about to commit a crime.[43]

In this case, what began as a welfare check was converted into an investigatory stop or detention when Davis removed Poche from the car and initiated a pat down.[44] Given Davis's admission that he had no articulable suspicion of criminal activity,[45] the pat down of Poche fails constitutional scrutiny. However, the Government argues that the emergency aid exception and the inevitable discovery doctrine saves the subject evidence from the exclusionary rule.

United States Supreme Court case law has "establish[ed] an exclusionary rule that,

---

[42] U.S. Const. amend. IV.
[43] *United States v. Monsivais*, 848 F.3d at 357 (5th Cir. 2017) *See also, United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014))(internal citations omitted).
[44] *Id.* at 358.
[45] Rec. Doc. 31, p. 89, ll. 16-18.
40939

when applicable, forbids the use of improperly obtained evidence at trial."[46] However, the mere occurrence of a Fourth Amendment violation, "i.e. that a search or arrest was unreasonable – does not necessarily mean that the exclusionary rule applies."[47] In applying the exclusionary rule, the Supreme Court has "focused on the efficacy of the rule in deterring Fourth Amendment violations in the future," and the "benefits of deterrence must outweigh the costs."[48] "The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go *free* – something that offends basic concepts of the criminal justice system."[49]

### B. Motion to Suppress

Generally, "[t]he proponent of a motion to suppress has the burden of proving, by a preponderance of the evidence**,** that the evidence obtained was in violation of his Fourth Amendment rights.[50] Conversely, at a suppression hearing, the Government must prove, by a preponderance of the evidence, that the challenged evidence was lawfully obtained.[51]

### C. Emergency Aid Exception

The Government argues that the emergency aid exception to the Fourth Amendment warrant requirement applies in the present case.[52] The Fifth Circuit in *U.S.*

---

[46] 555 U.S. 135, 140, 129 S.Ct. 695, 699-700, 172 L.Ed. 3d 496 (2009)(citing *Arizona v. Evans*, 514 U.S. 1, 10, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995)).

[47] *Id.*(citing *Illinois v. Gates*, 462 U.S. 213, 223, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

[48] *Id.*

[49] *Id.* at 701 (internal citations omitted)(quoting *United States v. Leon*, 468 U.S. 897, 908, 104 S.Ct. 3405 (1984)).

[50] *United States v. Kelley,* 981 F.2d 1464, 1467 (5th Cir.1993)(quoting *United States v. Smith*, 978 F.2d 171, 176 (5th Cir.1992)).

[51] *United States v. Valenzuela*, 716 F.Supp.2d 494, 500 (S.D. Tex. 2007)(citing *United States v. Matlock*, 415 U.S. 164, 178 n. 14 (1974)).

[52] Rec. Doc. 32.

40939

*v. Brand* examined the emergency aid exception in the context of police officers responding to a medical emergency.[53]  In *Brand,* police officers were dispatched to a dwelling, without a warrant, along with an ambulance, to assist a drug overdose victim.[54] When the officers entered the dwelling they "saw the defendant lying unconscious in his living room with hypodermic needles, marijuana butts, and several pills, all in plain view."[55] The Fifth Circuit held "the medical emergency justified the officers' presence only in the living room."[56]

The Fifth Circuit in *United States v. Toussaint* extended the emergency aid exception to the warrant requirement, to a vehicular stop;[57] "[] there is little reason to think that officers should be permitted to enter a home to help someone, [], but would somehow be foreclosed by the Fourth Amendment from stopping a car where, as one example, the officers had received a warning that the driver was armed and intended to kill himself upon reaching a certain destination."[58]  The *Toussaint* court further held, "the ultimate touchstone of the Fourth Amendment is 'reasonableness,' and the benevolent act of trying to notify a driver that his life is in danger epitomizes reasonableness."[59]  Accordingly, "in proper circumstances, the emergency-aid exception to the Fourth Amendment's warrant requirement can be used to justify a traffic stop…"[60]  The Court must determine "whether there was an objectively reasonable basis for such a belief [of an emergency], divorced

---

[53] 556 F.3d 1312, 1314 (5th Cir. 1977).
[54] *Id.*
[55] *Id.*
[56] *Id.* at 1318.
[57] 838 F.3d 503, 508 (5th Cir. 2016).
[58] *Id.*
[59] *Id.*
[60] *Id.* (internal citations omitted).
40939

from the officer's conduct;"[61] and "should consider the appearance of the scene of the search in the circumstances presented as it would appear to reasonable and prudent men standing in the shoes of the officers."[62] Fifth Circuit jurisprudence mandates the Court to further determine "whether the officer who engaged in conduct without a warrant acted reasonably."[63]

While this case does not present the reasonableness of a traffic stop, the Court finds the emergency aid exception is instructive on the issue of the Defendant's seizure from the vehicle. Here, when Sterling and Davis arrived on the scene the driver and Defendant were initially unresponsive.[64] The driver had injection sites on her arms consistent with intravenous drug use.[65] The behavior of both the Defendant and the driver, and the officers testimony that there was narcotics paraphernalia in the vehicle, created an objectively reasonable basis for the officers' belief that the driver and the Defendant were suffering from some type of drug overdose and were in need of emergency assistance, like the defendant in *Brand*.[66] Removing the Defendant and driver from the vehicle was reasonable to allow the officers to ascertain the degree of their impairment and effectively provide assistance. Under the circumstances, the Court finds that the officers acted reasonably in removing Poche from the car. Accordingly, the Court finds that the officers had an objectionably reasonable basis to conduct a warrantless seizure of the Defendant based on the emergency aid exception.

---

[61] *Id.* at 508-09.
[62] *Id.* at 509.
[63] 838 F.3d at 509 (5th Cir. 2016).
[64] *See supra* note 15.
[65] *See supra* note 12.
[66] *Id.* at p. 19, ll. 19-25, p. 51, p. 52, ll. 1-12.
40939

### D. Consent to Search

Davis asked the Defendant for his name after he was removed from the vehicle, and the Defendant was able to give his name to the officer.[67] Davis further testified that, once an individual identifies themselves, he requests identification documents to verify their identity, which he did in this case.[68] Once the Defendant was removed from the vehicle, Davis initiated a pat down search[69] and "after I began my pat down search, I asked him did he have any other identification to verify his name. He did tell me he had a[n] identification in his pocket of his pants. At that time, I did ask him if I could go in his front pocket to remove the ID. He said yes."[70] Davis's testimony that consent to obtain the ID was freely given was unchallenged.[71] "After getting [the Defendant's] permission, Davis reached into [the Defendant's] pocket, removed the identification, and handed it off to another officer to run through a larger database."[72] Given the absence of evidence and testimony that the Defendant's consent to obtain the ID was involuntary or unreliable, the Court finds that the Defendant consented to Davis's request to retrieve his ID. Even though Davis had initiated an unconstitutional pat down, the ID was not the fruit of that illegal search. Rather, the ID was obtained by consent.[73] The ID led to the discovery of the bench warrant which would have led to the inevitable discovery of the firearm.

---

[67] *Id.* at p. 53, ll. 9-15.
[68] *Id.* at ll. 16-21.
[69] *Id.* at p. 54, ll. 1-5.
[70] *Id.* at p. 54, ll. 1-5.
[71] *Id.*
[72] Rec. Doc. 32, pp. 4-5.
[73] "As we have noted, had Royer consented to a search on the spot, the search could have been conducted with Royer present in the area where the bags were retrieved by Officer Johnson and any evidence recovered would have been admissible against him." *Florida v. Royer*, 460 U.S. 491, 505, 103 S.Ct. 1319, 1328, 75 L.Ed.2d 229 (1983)).
40939

### E. Inevitable Discovery Doctrine

The Government argues that the inevitable discovery doctrine applies to the present case.[74]  Under the Government's theory, as soon as Davis had the Defendant's ID it was inevitable that the firearm would be discovered because the NCIC search would uncover the bench warrant.[75]  Davis testified that he would have arrested the Defendant on the outstanding bench warrant, even if he had not discovered the firearm on the pat down.[76]  According to Davis, a search incident to an arrest on the bench warrant would have resulted in the inevitable discovery of the gun which is the subject of the suppression motion.[77]  Such a search is proper under *Arizona v. Gant* wherein the United States Supreme Court held, "a search incident to arrest may only include the arrestee's person and the area 'within his immediate control'…"[78]

The Fifth Circuit in *U.S. v. Zavala* held, "[f]or the inevitable discovery exception to apply, 'the alternative means of obtaining the evidence must at least be in existence and, at least to some degree, imminent, if yet unrealized.'"[79]  Davis' statement that he pat down searches everyone he comes in contact with while on duty, regardless of whether he believes they pose a threat or danger,[80] is unquestionably a violation of the Fourth Amendment.[81]  Even though Davis's pat down of the Defendant was unconstitutional, and the circumstances beg the question of Davis's motives,[82] the firearm is nonetheless

---

[74] Rec. Doc. 30, p. 2.
[75] *Id.* at pp. 3-4.
[76] Rec. Doc. 31, p. 61, ll. 7-15.
[77] *Id.* at ll. 10-16.
[78] *Arizona v. Gant*, 556 U.S. 332, 338, 129 S.Ct. 1710, 1716, 173 L.Ed.2d. 485 (2009).
[79] 541 F.3d 562, 580 (5th Cir. 2008).
[80] *See supra* note 27.
[81] *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968).
[82] See Note 28 and related discussion, *supra.*

40939

admissible for the following reasons. The consensual discovery of the ID lead to the discovery of the Defendant's bench warrant, which would have resulted in Poche's arrest, and a search incident to said arrest would have resulted in the inevitable discovery of the firearm sought to be suppressed herein. [83] Accordingly, the Court finds that the alternative means of discovering the firearm was in existence at the time the pat down occurred, and it was inevitable that the firearm would be discovered based upon the Defendant's outstanding bench warrant.

## III. CONCLUSION

For the reasons set forth above, the Defendant's *Motion to Suppress*[84] is DENIED.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on <u>September 22, 2017</u>.

_____

**JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[83] Rec. Doc. 31, p. 57, ll. 6-15; p. 61, ll. 7-14.
[84] Rec. Doc. No. 39.
40939